RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CAROLINE CHEVALIER,

*Plaintiff-Appellant,*

*v.*

No. 14-3146

ESTATE OF KIMBERLY BARNHART,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-00609—James L. Graham, District Judge.

Decided and Filed: October 1, 2015

Before: KEITH, MOORE, and STRANCH, Circuit Judges.

———————————

**COUNSEL**

———————————

**ON BRIEF:** David W. Orlandini, Gary C. Safir, DAVIS & YOUNG, Westerville, Ohio, for Appellant. M. Shawn Dingus, PLYMALE & DINGUS, LLC, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Caroline Chevalier and Defendant-Appellee Kimberly Barnhart[1] met, fell in love, and were married. Throughout the course of their marriage, Chevalier made a series of loans to Barnhart, which Barnhart never repaid. Chevalier filed this lawsuit in the United States District Court for the Southern District

---

[1]While this appeal was pending, Barnhart died. Since Barnhart's death, Chevalier has substituted the Estate of Kimberly Barnhart as the real party in interest. For the sake of readability, we will refer to the defendant-appellee as Barnhart throughout the opinion.

of Ohio, alleging contract and tort claims in order to recover her loans. Chevalier alleges that the district court had subject-matter jurisdiction to adjudicate her claims pursuant to 28 U.S.C. § 1332(a) (2012) because she is "a citizen[] or subject[] of a foreign state," Canada, and Barnhart is a citizen of Ohio, *see id.* § 1332(a)(2), and Chevalier's claims for damages exceed $75,000. *See* R. 2 at 1, 10 (Compl. ¶¶ 1–2) (Page ID #2, 11). But there is a wrinkle: the so-called domestic-relations exception to federal diversity jurisdiction deprives federal courts of jurisdiction to adjudicate "only cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992). On Barnhart's motion, the district court concluded that Chevalier's lawsuit required dividing "the parties' property[, which] involves 'delicate issues of domestic relations' appropriately left to the Canadian court," and dismissed the suit pursuant to Federal Rule of Civil Procedure 12(b)(1). R. 11 at 12 (D. Ct. Op. & Order) (Page ID #77) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014)).

Chevalier appeals the district court's dismissal of her state-law claims, arguing that the domestic-relations exception is inapplicable. While this appeal was pending, Barnhart died. (Notice of Death of Appellee). Barnhart's death raised the specter of another potential impediment to federal jurisdiction: the probate exception. *See Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006) ("[T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court.").

For the reasons set forth in this opinion, we hold that neither the domestic-relations exception nor the probate exception prevents the federal courts from resolving Chevalier's claims. Accordingly, we **REVERSE** the district court's dismissal for lack of subject-matter jurisdiction, **VACATE** the entry of judgment, and **REMAND** the case for further proceedings.

# I. FACTS AND PROCEDURAL HISTORY

In July 2007, Chevalier and Barnhart wed in Ontario, Canada, where Chevalier is a citizen, and where the government permitted them to marry.[2] R. 2 at 1 (Compl. ¶¶ 1–2) (Page ID #2); R. 4 at 1 (Answer ¶¶ 1–2) (Page ID #13); R. 7-1 at 4 (Appl. for Divorce) (Page ID #36). After approximately three years of marriage, Chevalier's and Barnhart's relationship soured, and the couple separated. R. 7-1 at 4 (Appl. for Divorce) (Page ID #36).

Chevalier claims that she made a series of loans between 2007 and 2010 to Barnhart totaling approximately $122,708: $70,000 for mortgage payments, property taxes, insurance, utilities, and construction payments for Barnhart's house in Logan, Ohio; $23,700 for credit-card debt; $19,008 for a car; and $10,000 for legal fees. R. 2 at 2–3 (Compl. ¶¶ 6–16) (Page ID #3–4). According to Chevalier, each transfer of funds was a loan conditioned upon repayment. *See id.* (Compl. ¶ 18). Between 2010 and 2011, Barnhart made a series of payments to Chevalier in the amount of $3,000 as partial payment of her debt. *Id.* at 4 (Compl. ¶ 13) (Page ID #4). In April 2011, Barnhart gave Chevalier a check in the amount of $4,000 as a partial payment on her loans, but issued a stop-payment order shortly thereafter. *Id.* (Compl. ¶¶ 14–15). Eventually, apparently fed up with the slow rate of repayment, Chevalier filed this lawsuit in the United States District Court for the Southern District of Ohio, seeking approximately $119,708 in compensatory damages, $500,000 in punitive damages, interest, costs, and attorney fees for breach of contract (Count I), default on loans (Count II), unjust enrichment (Count III), and fraud (Count IV). *Id.* at 3–10 (Compl. ¶¶ 1–55) (Page ID #4–11). She also requests that the court impose a constructive lien on Barnhart's house in Logan, Ohio (Count V), and foreclose on the property (Count VI). *Id.* at 8–9 (¶¶ 56–67) (Page ID #9–10).

On August 20, 2013, shortly before filing the answer to Chevalier's complaint, Barnhart filed for divorce in Windsor, Ontario, seeking spousal support and an equalization of net family properties. R. 7-1 at 2–3, 5 (Appl. for Divorce) (Page ID #34–35, 37). On August 23, 2013, Barnhart answered the federal complaint, denying all allegations and asserting numerous affirmative defenses, including lack of subject-matter jurisdiction. R. 4 at 1–5 (Answer ¶¶ 5–24)

---

[2]At the time of Chevalier's and Barnhart's wedding, the State of Ohio refused to solemnize their union. While this appeal was pending, the United States Supreme Court held that state bans on same-sex marriage are unconstitutional. *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

(Page ID #13–18).  Shortly thereafter, on September 30, 2013, Barnhart moved to dismiss the federal complaint pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction under the domestic-relations exception to federal diversity jurisdiction.  R. 7 at 1–7 (Def.'s Mot. to Dismiss) (Page ID #26–32).  In Barnhart's district-court reply brief, she clarified that she was also seeking abstention and urged the district court to stay the federal proceedings until the Ontario Superior Court resolved the application for divorce.  R. 10 at 6–7 (Def.'s Rep. to Pl.'s Mem. in Opposition to Mot. to Dismiss) (Page ID #63–64).

On January 15, 2014, the district court dismissed the complaint on the grounds that the court lacked subject-matter jurisdiction under the domestic-relations exception to federal diversity jurisdiction.  R. 11 at 12 (D. Ct. Op. & Order) (Page ID #77).  The district court acknowledged that Chevalier had "framed her complaint in terms of contract and tort claims"— rather than a request for a divorce or alimony decree—but that, nevertheless, the domestic-relations exception barred her claims because she sought "the functional equivalent of a divorce proceeding[] insofar as [Chevalier] has, in effect, asked this court to determine her marital property rights and obligations with respect to the monies referred to in the complaint." *Id.* at 10 (Page ID #75).  In particular, the district court concluded that the Superior Court of Justice in Ontario would consider Chevalier's claim of right to the money at issue in her tort and contract claims when determining Barnhart's right to spousal support and equalization of net family properties. *Id.* at 11 (Page ID #76).  The district court also expressed concern that the federal proceedings might subject the parties to "incompatible federal [American] and Canadian decrees." *Id.*  Finally, the district court noted concern that Ohio's then-existing ban on same-sex marriages would affect the outcome of the federal proceedings. *Id.* at 11–12 (Page ID #76–77) (citing OHIO CONST. art. XV, § 11; OHIO REV. CODE § 3101.01(C) (2014)).  The district court never addressed Barnhart's request that the court abstain from adjudicating this case. *See id.* at 1–12.

Chevalier filed this timely appeal.  On September 2, 2014, while this appeal was pending, Barnhart died.  We stayed the appellate proceedings.  Chevalier filed a motion to substitute the Estate of Kimberly Barnhart as the party in interest and lift the stay.  On October 30, 2014, the Superior Court of Justice in Windsor, Ontario, dismissed the parties' divorce proceedings

without terminating the marriage or disposing of the parties' assets or property. Appellant's Notice of Canadian Ct.'s Dismissal of Divorce Proceedings at 2–3; Appellant's Mem. in Resp. to Ct.'s Briefing Ltr. at 7. Before we ruled on Chevalier's motion to substitute Barnhart's estate as the real party in interest, proceedings began in the Probate Court of Hocking County, Ohio, to administer Barnhart's estate. On February 9, 2015, the Probate Court appointed Karla S. Mayberry as the administrator of Barnhart's estate. Appellant's Supplemental Notice of Probate Court's Order at 2. We subsequently granted Chevalier's motion for substitution of parties.

These developments caused us to consider whether the probate exception to federal jurisdiction might prevent adjudication of Chevalier's state-law claims in federal court, and we ordered the parties to address the issue in supplemental briefs. We now turn to answer the question: should the domestic-relations or probate exceptions limit the federal courts' subject-matter jurisdiction in this case?

## II. ANALYSIS

We review de novo a district court's dismissal of a complaint for lack of subject-matter jurisdiction. *Wisecarver v. Moore*, 489 F.3d 747, 749 (6th Cir. 2007). The plaintiff has the burden of proving that the federal court has subject-matter jurisdiction. *Id.* "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

### A. The Domestic-Relations Exception to Federal Diversity Jurisdiction

"[T]he domestic-relations exception [to federal diversity jurisdiction] encompasses only cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt*, 504 U.S. at 704. It is not "compelled by the text of the Constitution or federal statute," but rather is a "judicially created doctrine[] stemming in large measure from misty understandings of English legal history." *Marshall*, 547 U.S. at 299. Despite the domestic-relations exception's questionable roots, the Supreme Court concluded in *Ankenbrandt* that the domestic-relations exception to federal diversity jurisdiction endures to this day as a matter of statutory interpretation. *See Ankenbrandt*, 504 U.S. at 700. In addition, there are sound policy reasons to

leave the issuance of divorce, alimony, and child-custody decrees to the state courts: "Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance," and "state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over divorce, alimony, and child custody decrees." *Id.* at 703–04. In addition, state courts have "judicial expertise" in the area of "issu[ing] these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees." *Id.* at 704 (citing *Lloyd v. Loeffler*, 694 F.2d 489, 492 (7th Cir. 1982)).[3]

Although the Court retained the domestic-relations exception to federal diversity jurisdiction, the Court expressed concern that "the lower federal courts ha[d] applied [the domestic-relations exception] in a variety of circumstances . . . [that] go well beyond the circumscribed situations" where it applies. *Id.* at 701 (internal citation omitted). The Court made clear that the domestic-relations exception extended no further than "cases involving the issuance of a divorce, alimony, or child custody decree." *Id.* at 704. And the Court specifically held that the Court of Appeals had erred by invoking the domestic-relations exception to prevent federal adjudication of a claim that "in no way seeks such a decree," but rather "alleges that [the defendants] committed torts against . . . [the plaintiff's] children by [one of the defendants]." *Id.*

Since *Ankenbrandt*, the Court has reemphasized "that the [domestic-relations] exception covers only 'a narrow range of domestic relations issues,'" *Marshall*, 547 U.S. at 307 (quoting *Ankenbrandt*, 504 U.S. at 701), and that federal courts "'have no more right to decline the

---

[3]In *Lloyd*, the Seventh Circuit noted that federal courts are not competent to handle divorce proceedings for the following reasons:

> The typical divorce decree provides for alimony payable in installments until the wife remarries, and if there are children it will provide for custody, visitation rights, and child support payments as well. These remedies—alimony, custody, visitation, and child support—often entail continuing judicial supervision of a volatile family situation. The federal courts are not well suited to this task. They are not local institutions, they do not have staffs of social workers, and there is too little commonality between family law adjudication and the normal responsibilities of federal judges to give them the experience they would need to be able to resolve domestic disputes with skill and sensitivity.

694 F.2d at 492.

exercise of jurisdiction which is given, than to usurp that which is not given,'" *id.* at 298–99 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). The message from *Ankenbrandt* and *Marshall* is clear: the domestic-relations exception is narrow, and lower federal courts may not broaden its application.

We have had few occasions to address the scope of the domestic-relations exception since *Ankenbrandt*. In the first post-*Ankenbrandt* case in this circuit, the plaintiff "sought a final declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Arizona state court judgment" was invalid under federal law and the United States Constitution. *See Catz v. Chalker*, 142 F.3d 279, 289 (6th Cir. 1998), *overruled on other grounds by Coles v. Granville*, 448 F.3d 853, 859 n.1 (6th Cir. 2006). On appeal, we considered the impact of *Ankenbrandt* and concluded that the domestic-relations exception does not apply unless "a plaintiff positively sues in federal court for divorce, alimony, or child custody," *id.* at 292, thereby rejecting the contention that the domestic-relations exception applies to "every case touching and concerning the issuance of a divorce, the award of alimony, or a child custody decree," *id.* at 292 n.14. *See also Drewes v. Ilnicki*, 863 F.2d 469, 471–72 (6th Cir. 1988) ("The federal courts may not refuse jurisdiction merely because the parties were at one time in a marital relationship and the motive for the tort may spring from that source."). Because the plaintiff had not "positively sue[d] in federal court for divorce, alimony, or child custody," we held that the district court had erred by "refusing to assume jurisdiction." *Catz*, 142 F.3d at 292.

Since *Catz*, our cases have clarified that the domestic-relations exception deprives federal courts of diversity jurisdiction if the plaintiff seeks to modify or interpret the terms of an existing divorce, alimony, or child-custody decree. In *McLaughlin v. Cotner*, we held that the domestic-relations exception deprived the federal courts of jurisdiction to adjudicate a breach-of-contract claim arising from the alleged breach of a divorce decree. The divorce decree incorporated a separation agreement that required the sale of real estate. 193 F.3d 410, 414 (6th Cir. 1999). The basis for the alleged breach of contract was "a separation agreement that was incorporated in the divorce decree," and it was important that the divorce decree—not "the law of contract or torts"—was the source of the obligations that the plaintiff sought to enforce. *Id.* In other words, *McLaughlin* stands for the uncontroversial proposition that a plaintiff may not artfully cast a suit

seeking to modify or interpret the terms of a divorce, alimony, or child-custody decree as a state-law contract or tort claim in order to access the federal courts. *See id.* at 414–15 ("Plaintiff's argument that the present case is a straightforward breach of contract case and that an action for damages lies under Ohio law is disingenuous, as the separation agreement was entered into in order to determine the rights and obligations concerning marital property upon separation and divorce."); *see also Firestone v. Cleveland Trust Co.*, 654 F.2d 1212, 1216 (6th Cir. 1981) ("It is incumbent upon the district court to sift through the claims of the complaint to determine the true character of the dispute to be adjudicated."); *cf. Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 561 (6th Cir. 2007) (en banc) ("Under the artful-pleading doctrine, a federal court will have jurisdiction if a plaintiff has carefully drafted the complaint so as to avoid naming a federal statute as the basis for the claim, and the claim is in fact based on a federal statute." (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 22 (1983))).[4]

Our sibling circuits have also limited the domestic-relations exception to suits seeking to obtain or modify a divorce, alimony, or child-custody decree. *See, e.g., Matusow v. Trans-County Title Agency, LLC*, 545 F.3d 241, 246 (3d Cir. 2008) (reasoning that a "modification of a divorce decree is analogous to the issuance of a divorce decree," and therefore subject to the domestic-relations exception to federal diversity jurisdiction); *Norton v. McOsker*, 407 F.3d 501, 505 (1st Cir. 2005) ("Even if the Rhode Island Family Court *did* have jurisdiction, the domestic

---

[4]In various unpublished cases, we have continued to limit the domestic-relations exception to "cases involving the issuance of a divorce, alimony, or child custody decree," *Ankenbrandt*, 504 U.S. at 704, and cases seeking to modify or interpret a divorce, alimony, or child custody decree. *See, e.g., Abdallah v. Abdallah*, No. 98-1551, 1999 WL 331631, at *1 (6th Cir. May 13, 1999) (holding that the domestic-relations exception barred federal adjudication of a state-law fraud action because the plaintiff "essentially" sought "a modification of the process in the divorce decree relating to distribution"); *Chambers v. Michigan*, 473 F. App'x 477, 478–79 (6th Cir. 2012) (holding that the domestic-relations exception prevented the plaintiff from challenging in federal court the constitutionality of the state-court judge's "decision to consider certain assets and property" when calculating the plaintiff's husband's income for the purposes of determining alimony payments because the plaintiff "ultimately want[ed] this [c]ourt to enjoin the state court from using property . . . to determine the amount of alimony owed").

Admittedly, this court has not always been consistent. For example, in *United States v. MacPhail*, 149 F. App'x 449, 455 (6th Cir. 2005), which the district court relied on, this court held that the district court could not exercise supplemental jurisdiction over cross-claims that had a "family law character." Because *MacPhail* is unpublished, however, it is binding on only the parties and not on this court. *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011) ("Unpublished decisions in the Sixth Circuit are, of course, not binding precedent on subsequent panels ….").

Moreover, *MacPhail* did not address whether the cross-claims were subject to the domestic-relations exception to *diversity* jurisdiction, but rather held that the district court should not have exercised discretionary supplemental jurisdiction over cross-claims presenting questions of state domestic-relations law.

relations exception . . . would not apply[] because [the plaintiff] did not bring any claim related to a divorce, alimony, or a child custody decree."); *Dunn v. Cometa*, 238 F.3d 38, 41 (1st Cir. 2001) ("[L]awsuits affecting domestic relations, however substantially, are not within the [domestic-relations] exception unless the claim at issue is one to obtain, alter or end a divorce, alimony or child custody decree."); *Lloyd*, 694 F.2d at 493 (holding that the domestic-relations exception to federal diversity jurisdiction does not prevent federal courts from adjudicating a tort action when the plaintiffs do "not contest the validity of the [state] custody decree," because "the tort issues . . . [were] not entangled with issues that only state courts are competent to resolve."). Thus, the domestic-relations exception to federal diversity jurisdiction does not deprive federal courts of jurisdiction to adjudicate a claim that meets the requirements of 28 U.S.C. § 1332 unless "a plaintiff positively sues in federal court for divorce, alimony, or child custody," *Catz*, 142 F.3d at 292, or seeks to modify or interpret an existing divorce, alimony, or child-custody decree.

When analyzing the applicability of the domestic-relations exception, we must focus on the remedy that the plaintiff seeks: Does the plaintiff seek an issuance or modification or enforcement of a divorce, alimony, or child-custody decree? *See Catz*, 142 F.3d at 292; *Cf. Mercer v. Bank of New York Mellon, N.A.*, 609 F. App'x 677, 679–80 (2d Cir. 2015) (holding that under the probate exception to federal diversity jurisdiction a court "must examine the substance of the relief that Plaintiffs are seeking, and not the labels that they have used"). If the plaintiff is seeking to dissolve the marriage and resolve all matters concerning property and children, then the case falls within the domestic-relations exception. *See* BLACK'S LAW DICTIONARY 498 (10th ed. 2014) (defining "divorce decree"). If the plaintiff asks a federal court to calculate and order payment of an allowance for maintenance of a spouse during divorce proceedings or after a divorce is finalized, then the plaintiff seeks alimony and a federal court may not take jurisdiction over the matter. *See id.* at 89 (defining "alimony"). And if the plaintiff requests that a federal court determine who should have care for and control a child, then that request is outside the jurisdiction of the federal courts. *See id.* 292, 467 (defining "custody" and "custody decree"). Each of these *remedies*, which are typically attendant to the dissolution of a marriage, "entail continuing judicial supervision of a volatile family situation," and federal courts are poorly equipped to handle that task. *Lloyd*, 694 F.2d at 492; *see also Ankenbrandt*,

504 U.S. at 703–04 ("Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance."). In sum, "both *Ankenbrandt* and *Marshall* consistently conclude that the exception relates not to the subject of domestic relations, but to particular status-related *functions* that fall within state power and competence." 13E CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3609.1 (3d ed. 2008) (emphasis added).

The domestic-relations exception to federal diversity jurisdiction does not apply when the parties do not ask the federal court to perform these status-related functions—issuing a divorce, alimony, or child-custody decree—even if the matter involves married or once-married parties. "[F]ederal courts [are] as equally equipped [as state courts] to deal with complaints alleging the commission of torts" and breach of contract. *Marshall*, 547 U.S. at 308 (citing *Ankenbrandt*, 504 U.S. at 704).

We now turn to whether Chevalier seeks the issuance or modification of a divorce, alimony, or child-custody decree. In doing so, we focus on the remedy Chevalier seeks. Although Chevalier does not explicitly request dissolution of her marriage or calculation of alimony, the district court concluded that Chevalier has asked that the federal courts perform the "functional equivalent of divorce proceedings" because the court must "determine her marital property rights and obligations with respect to the monies referred to in the complaint." R. 11 at 10 (D. Ct. Op. & Order) (Page ID #75). In other words, the district court concluded that Chevalier was seeking an order regarding the "allocation of marital property and the award of alimony," which "would involve the same factual and legal issues" that were "before the Superior Court of Justice, Windsor, Ontario as part of the pending divorce proceedings," and therefore Chevalier's claims fall within the ambit of the domestic-relations exception to federal diversity jurisdiction. *Id.* at 10–11 (Page ID #75–76).

We disagree. Chevalier does not request that the federal courts nullify her marriage. *See* R. 2 at 10 (Compl.) (Page ID #11). She does not seek an order that Barnhart regularly pay her an allowance, i.e., alimony. *Id.* Nor does Chevalier seek to modify an existing divorce or alimony decree; indeed, none exists. Rather, Chevalier requests that the federal court adjudicate whether she is entitled to repayment for past-due loans and a legal interest in Barnhart's Ohio

property. *See id.* at 3–9 (Compl. ¶¶ 17–67) (Page ID #4–10). Because none of the claims or remedies requires a federal court to dissolve the marriage, award alimony, monitor Chevalier's need for maintenance and support, or enforce Barnhart's compliance with a related court order, Chevalier's claims are not subject to the domestic-relations exception to federal diversity jurisdiction. *See Ankenbrandt*, 504 U.S. at 703–04.

Finally, we acknowledge that our approach is slightly different from that of the Eighth Circuit. In *Wallace v. Wallace*, the Eighth Circuit held that a person who claimed that his ex-wife committed identity theft could not litigate his claim in federal court because a Missouri family court had already "consider[ed] 'the conduct of the parties during the marriage'" and "labeled the debt 'marital'" before dividing the debt between the two ex-spouses. 736 F.3d 764, 767 (8th Cir. 2013) (quoting Mo. Rev. Stat. § 452.330.1(4)). The Eighth Circuit concluded that any determination that the plaintiff's ex-wife had committed identity theft would "modify the state court's marital distribution" because "a Missouri state court bound by [Missouri Revised Statute] § 452.330.1(4) [had] consider[ed] 'the conduct of the parties during the marriage'" because of the similarities between the evidence presented in the two proceedings. *Id.* (internal alterations omitted).

We do not adopt the Eighth Circuit's approach to determining whether the domestic-relations exception to federal diversity jurisdiction applies. In concluding that the plaintiff's state identity-theft damages remedy in federal court "would modify the state court's marital distribution, the Eighth Circuit relied on the statutorily required considerations that a divorce court must consider before dividing property and awarding alimony." *Id.* ("These [identity-theft] remedies would essentially require that the federal court remove the label 'marital debt' and reallocate the debt division the state court has already 'deem[ed] just after considering' the conduct at issue here." (quoting Mo. Rev. Stat. § 452.330.1) (alterations in original)). When a court distributes marital property, it does so in accordance with the parties' "rights and obligations [that] aris[e] from [their] marital *status*,"—i.e., in accordance with state family law— and not the law of torts or contracts. *McLaughlin*, 193 F.3d at 414 (emphasis added). Although the distribution of marital property under state law may require that courts consider the spouses' conduct—conduct that may or may not constitute tortious conduct—that does not affect the

federal courts' subject-matter jurisdiction.  Stated simply, state law does not determine the scope of our jurisdiction.  *See Marshall*, 547 U.S. at 314 (holding that Texas's probate statute does not affect whether the probate exception to federal jurisdiction applies to a case).  Moreover, in situations like *Wallace*, other doctrines, such as res judicata or collateral estoppel, may prevent federal plaintiffs from relitigating issues raised in a prior divorce proceeding, "but these are defenses rather than jurisdictional obstacles." *Jones v. Brennan*, 465 F.3d 304, 305–06 (7th Cir. 2006) (holding that a suit for compensatory and punitive damages against various probate judges for conspiracy to deprive the plaintiff of property during the probate proceedings was not barred by the probate exception or *Rooker-Feldman* abstention doctrine).  We therefore believe that the Eighth Circuit's approach extends the domestic-relations exception "well beyond the circumscribed situations" described by the Supreme Court in *Ankenbrandt*:  "the issuance of a divorce, alimony, or child custody decree."  504 U.S. at 704.

Our opinion today also departs from the Seventh Circuit's opinion in *Friedlander v. Friedlander*, 149 F.3d 739 (7th Cir. 1998).  In that case, the court noted that the domestic relations exception "has a core and a penumbra."  *Id.* at 740.  The core consists of cases "in which the plaintiff is seeking in federal district court under the diversity jurisdiction one or more of the distinctive forms of relief associated with the domestic relations jurisdiction: the granting of a divorce or an annulment, an award of child custody, a decree of alimony or child support." *Id.*  By contrast, the penumbra "consists of ancillary proceedings . . . that state law would require be litigated as a tail to the original domestic relations proceeding." *Id.*  The court acknowledged that supposed dicta in *Ankenbrandt* "cast[s] doubt on the existence of the penumbra," but concluded that issues of the penumbra were not before the Court.  *Id.*  However, that is not how we read *Ankenbrandt*, and we are reluctant to broaden the exception beyond what the Supreme Court has advised.

The district court here noted an additional "policy reason[]" for its conclusion that the federal courts do not have subject-matter jurisdiction to adjudicate Chevalier's claims:  "the danger . . . that federal adjudication of this action would increase the risk of incompatible federal and Canadian decrees."  R. 11 at 11 (D. Ct. Op. & Order) (Page ID #76).  But when Chevalier filed her complaint in federal court, no such risk was present; Barnhart filed for divorce in

Canada after Chevalier filed this federal lawsuit. Nor does that risk exist now; the Superior Court of Justice in Ontario dismissed Chevalier's and Barnhart's divorce proceedings upon notice of Barnhart's death. In any event, whether Barnhart initiated divorce proceedings before or after Chevalier filed her federal civil suit does not affect whether the federal court has *subject-matter jurisdiction* to adjudicate Chevalier's claims because our subject-matter jurisdiction is based on the remedy Chevalier seeks, not whether Chevalier filed her suit before or after Barnhart brought suit.

### B. The Probate Exception

The "'probate exception,' kin to the domestic relations exception, to otherwise proper federal jurisdiction[] . . . has [also] been linked to language contained in the Judiciary Act of 1789."[5] *Marshall*, 547 U.S. at 308 (internal citations omitted). Like the domestic-relations exception, the probate exception is based on questionable interpretations of the division of labor between the English courts. *See Marshall*, 547 U.S. at 316 (Stevens, J., concurring in part and concurring in the judgment) ("The Court is content to . . . accept as foundation for the probate exception *Markham*'s bald assertion that the English High Court of Chancery's jurisdiction did not 'extend to probate matters' in 1789. I would not accept that premise. . . . [T]he most comprehensive article on the subject has persuasively demonstrated that *Markham*'s assertion is 'an exercise in mythography.'" (citing John F. Winkler, *The Probate Jurisdiction of the Federal Courts*, 14 PROB. L. J. 77, 126 (1997) (internal citation omitted)).

Despite the probate exception's questionable origins, it also endures. In *Markham v. Allen*, 326 U.S. 490, 494 (1946), the Supreme Court stated that "a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court . . . ." *Id.* The Court clarified, however,

> that federal courts of equity have jurisdiction to entertain suits "in favor of creditors, legatees and heirs" and other claimants against a decedent's estate "to establish their claims" so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.

---

[5]The Seventh Circuit has remarked that the domestic-relations and probate exceptions "are materially identical. The fact that they are two rather than one reflects nothing more profound than the legal professions' delight in multiplying entities." *Struck v. Cook Cnty. Pub. Guardian*, 508 F.3d 858, 859 (7th Cir. 2007).

*Id.* (quoting *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43 (1909)). Applying this framework, the Court considered whether the petitioner who "sought a judgment in [federal court] ordering defendant executor to pay over the entire net estate to the petitioner upon an allowance of the executor's final account," *id.* at 495, was subject to the probate exception when the will had been "admitted to probate" and "the estate [was] being administered in the Superior Court of California," *id.* at 492. The Court concluded that the remedy the petitioner sought was "not an exercise of probate jurisdiction or an interference with property in the possession or custody of a state court" because "[t]he effect of the judgment . . . [would leave] undisturbed the orderly administration of decedent's estate in the state probate court." *Id.* at 495.

After *Markham*, "[l]ower federal courts . . . puzzled over the meaning of the words 'interfere with the probate proceedings,' and some . . . read those words to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate." *Marshall*, 547 U.S. at 311 (quoting *Markham*, 326 U.S. at 494). In *Marshall*, the Supreme Court reined in expansive application of the probate exception and clarified that "the 'interference' language in *Markham* [is] essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Id.*[6]

> Thus, the probate exception reserves to the state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Id.* at 311–12. In *Marshall*, the relief that the plaintiff sought was "an *in personam* judgment against [the defendant]"—for a "widely recognized tort" (tortious interference with an expected gift)—"not the probate or annulment of a will." *Id.* at 312. "Nor [did the plaintiff] seek to reach a *res* in the custody of a state court." *Id.* Nor did any "'sound policy considerations' militate in favor of extending the probate exception . . . ." *Id.*

---

[6]The Court specifically noted that this court's treatment of the probate exception in *Lepard v. NBD Bank, Div. of Bank One*, 384 F.3d 232, 234–37 (6th Cir. 2004), extended the probate exception "well beyond probate of a will or administration of a decedent's estate." *Marshall*, 547 U.S. at 311. We therefore conclude that our application of the probate exception in *Lepard* was overly broad, and that *Marshall* has superseded *Lepard*.

In addition, the Court addressed whether a Texas provision that "reserve[d] to its probate courts the exclusive right to adjudicate a transitory tort" deprived the federal courts of jurisdiction to adjudicate the tort claim. *Id.* at 313–14. There was no dispute that "Texas law govern[ed] the substantive elements of [the plaintiff's] tortious interference claim." *Id.* at 313 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). But the Court firmly rejected the proposition that a federal court's subject-matter jurisdiction is dependent upon state law: "Jurisdiction is determined 'by the law of the court's creation and cannot be defeated by the extraterritorial operation of a state statute, even though it created the right of action.'" *Id.* at 314 (quoting *Tennessee Coal, Iron & R.R. Co. v. George*, 233 U.S. 354, 360 (1914)) (internal alterations omitted). We therefore look to only federal law to determine whether the probate exception to federal diversity jurisdiction applies.

Since *Marshall*, we and our sibling circuits have agreed that the probate exception is narrowly limited to three circumstances: (1) if the plaintiff "seek[s] to probate . . . a will"; (2) if the plaintiff "seek[s] to . . . annul a will"; and (3) if the plaintiff "seek[s] to reach the *res* over which the state court had custody." *Wisecarver*, 489 F.3d at 750; *see also Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*, 777 F.3d 678, 681 (4th Cir. 2015) ("[The probate exception] applies only if a case actually requires a federal court to perform one of the acts specifically enumerated in *Marshall*: to probate a will, to annul a will, to administer a decedent's estate; or to dispose of property in the custody of a state probate court. A case does not fall under the probate exception if it merely impacts a state court's performance of one of these tasks."); *Curtis v. Brunsting*, 704 F.3d 406, 409 (5th Cir. 2013) ("*Marshall* requires a two-step inquiry into (1) whether the property in dispute is estate property within the custody of the probate court and (2) whether the plaintiff's claims would require the federal court to assume *in rem* jurisdiction over that property."); *Three Keyes Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 227 (3d Cir. 2008) ("It is clear after *Marshall* that unless a federal court is endeavoring to (1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court, the probate exception does not apply.").

Chevalier does not request that the federal courts probate or annul a will, or administer Barnhart's estate, and so the question we must answer is whether Chevalier "seek[s] to reach the

*res* over which the state court had custody." *Wisecarver*, 489 F.3d at 750. First, we must identify whether Chevalier's causes of action are *in personam* or *in rem* actions. An *in personam* action is "[a]n action brought against a person rather than property," and the judgment "is binding on the judgment-debtor and can be enforced against all the property of the judgment-debtor." BLACK'S LAW DICTIONARY, *supra*, 36. An *in rem* action is "[a]n action determining the title to property and the rights of the parties, not merely among themselves, but also against all persons at any time claiming an interest in that property," or "[a]n action in which the named defendant is real or personal property." *Id.* In other words, *in rem* actions "are fights over a property or a person in the court's control." *Struck v. Cook Cnty. Pub. Guardian*, 508 F.3d 858, 860 (7th Cir. 2007). The property within the control of the court is the *res*. *Id.* Next, our task is to determine whether Chevalier has asked a federal court to "elbow its way into" an ongoing "fight[] over a property or a person in [another] court's control." *Id.*

Here, Chevalier has asserted six claims. Her first four claims—for breach of contract, default, unjust enrichment, and fraud—are *in personam* actions. *See, e.g.*, 71 AM. JUR. 2D SPECIFIC PERFORMANCE § 196 (2d ed. 2015) ("[A]n action for specific performance of a contract, even though it relates to real property, is in personam insofar as it is sought to compel performance by the defendant . . . ."). For her fifth claim, Chevalier seeks the imposition of a constructive lien on Barnhart's house in Ohio. R. 2 at 8 (Compl. ¶¶ 56–62). Under Ohio law,[7]

> A constructive trust is . . . an appropriate remedy against unjust enrichment. This type of trust is usually invoked when property has been acquired by fraud. However, a constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud.

*Ferguson v. Owens*, 459 N.E.2d 1293, 1295 (Ohio 1984). A judgment imposing a constructive trust over a specified property is an *in personam* action under Ohio law, and the court need not have *in rem* jurisdiction to enter the judgment. *Groza-Vance v. Vance*, 834 N.E.2d 15, 25–26 (Ohio Ct. App. 2005); *see also Ingersoll v. Coram*, 211 U.S. 335, 359 (1908) ("One object of the bill . . . was to declare and foreclose a lien upon property within the district, . . . and we do not think that jurisdiction thus established [in federal court] and supported was taken away by the

---

[7]Although Chevalier does not specifically cite Ohio law in her complaint, we assume that Ohio law is the law we must apply under *Erie R.R. Co.*, 304 U.S. at 78, because the property in dispute is in Ohio.

mere fact that the settlement of the estate of Davis was pending in the Probate Court of Suffolk County."); *Parker v. Handy (In re Handy)*, 624 F.3d 19, 22 (1st Cir. 2010) (holding that, under Maine law, "[c]onstructive trusts are not substantive rights that confer a cause of action; they are remedial devices employed by courts once liability is found and where equity requires," and therefore do not transform a case seeking that remedy into a cause of action in rem) (citing *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1176 (10th Cir. 2009); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 409 (5th Cir. 2004)). Thus, Chevalier's claim seeking to impose a constructive trust is not an *in rem* action, and so her fifth claim is not barred by the probate exception.

Chevalier's sixth claim seeking foreclosure, however, requires that a court assume *quasi in rem* jurisdiction of the property at issue. *Huntington Mortg. Co. v. Shanker*, 634 N.E.2d 641, 648 (Ohio Ct. App. 1993); 59A C.J.S. MORTGAGES § 874 (2015); ); BLACK'S LAW DICTIONARY, *supra* (defining *quasi in rem* action as action "involving or determining the rights of a person having an interest in property located within the court's jurisdiction"). At the time Chevalier filed this suit in federal court, no probate court was exercising *in rem* jurisdiction over Barnhart's home; however, after Barnhart died, the Probate Court of Hocking County assumed *in rem* jurisdiction over Barnhart's home because the home is part of her estate. As a general rule, when diversity provides the basis for federal jurisdiction, "'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)). The time-of-filing rule "measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing." *Id.* at 571. The rule applies "regardless of the costs it imposes." *Id.* We have not found any case addressing whether to assess the applicability of the probate exception at the time of filing, or whether events that occur after filing and service of the federal complaint can strip the federal court of subject-matter jurisdiction. The Supreme Court has addressed similar circumstances in two contexts that are closely related to the probate exception: prior-exclusive-jurisdiction doctrine and forfeiture.

Pursuant to the doctrine of prior exclusive jurisdiction, "[i]f two suits are in rem or quasi in rem, so that the court must have possession or some control over the property in order to grant

the relief sought, the jurisdiction of one court must yield to that of the other." *Cartwright v. Garner*, 751 F.3d 752, 761 (6th Cir. 2014); *see also Chapman v. Deutsche Bank Nat'l Trust Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011). The prior-exclusive-jurisdiction doctrine is similar—if not identical to—the probate exception. Indeed, when describing how the prior-exclusive-jurisdiction doctrine operates, courts have used the language of *Marshall*: "'when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*.'" *Chapman*, 651 F.3d at 1043 (quoting *Marshall*, 547 U.S. at 311) (citing *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466–67 (1939)). The rule provides "that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other." *Princess Lida*, 305 U.S. at 466. *In rem* jurisdiction attaches when a complaint is filed, process issued, and process duly served. *Farmers' Loan & Trust Co. v. Lake St. Elevated R.R. Co.*, 177 U.S. 51, 61 (1900). A defendant cannot "defeat jurisdiction thus acquired." *Id.*; *see also Sexton v. NDEX W., LLC*, 713 F.3d 533, 537 (9th Cir. 2013) ("The doctrine of prior exclusive jurisdiction applies to a federal court's jurisdiction over property only if a state court has previously exercised jurisdiction over that same property and retains that jurisdiction in a separate, concurrent proceeding."). Thus, courts assess whether the doctrine of prior exclusive jurisdiction applies at the time of filing, and not at any time thereafter.

Case law addressing the federal courts' subject-matter jurisdiction in forfeiture actions is also instructive because forfeiture is also an *in rem* action. In *Republic National Bank of Miami v. United States*, the Supreme Court addressed whether the federal courts lose subject-matter jurisdiction to adjudicate a forfeiture action if the property in dispute has been removed from the court's judicial district. 506 U.S. 80, 83–84 (1992). The Court held: "Stasis is not a general prerequisite to the maintenance of jurisdiction," and therefore "in an *in rem* forfeiture action, the Court of Appeals is not divested of jurisdiction by the prevailing party's transfer of the res from the district." *Id.* at 88–89. The only exception that the Court noted is "where the release of the property would render the judgment 'useless' because 'the thing could neither be delivered to the libellants, nor restored to the claimants.'" *Id.* at 85 (quoting *United States v. The Little Charles*, 26 F. Cas. 979, 982 (No. 15,612) (CC Va. 1818) (Marshall, C.J.)). Therefore, in the context of a forfeiture action, an event that occurs after the complaint is filed does not divest a court of subject-matter jurisdiction over the property.

With these principles in mind, we now hold that the probate exception does not divest a federal court of subject-matter jurisdiction unless a probate court is already exercising *in rem* jurisdiction over the property at the time that the plaintiff files her complaint in federal court. Accordingly, the probate exception does not divest the federal courts of subject-matter jurisdiction to adjudicate Chevalier's foreclosure action because, at the time she filed the federal complaint, the property that she seeks to foreclose was not "in the custody of a state probate court." *Marshall*, 547 U.S. at 311. Once jurisdiction vested in the federal courts, Barnhart's subsequent death and the admission of her estate to state probate court did not divest the federal court of subject-matter jurisdiction.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's dismissal for lack of subject-matter jurisdiction, **VACATE** the judgment, and **REMAND** this case for further proceedings consistent with this opinion.