# United States Court of Appeals
## For the First Circuit

No. 16-1053

DAWN E. IRISH,

Plaintiff, Appellee,

v.

CRAIG S. IRISH,

Defendant, Appellant,

PEBBLE NUCLEAR, INC., f/k/a Nuclear Logistics, Inc.;
ARON SEIKEN,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Robert J. O'Regan, with whom Laura R. Studen, Elizabeth G.
Crowley, Andrea L. Martin, and Burns & Levinson LLP were on brief,
for appellant.
Sean T. Carnathan, with whom O'Connor, Carnathan and Mack
LLC, Michael Gottfried, and Duane Morris LLP were on brief, for
appellee.

November 14, 2016

**LYNCH**, **Circuit Judge**.  This appeal comes to us from the district court's award of damages to Dawn Irish arising out of her 2010 divorce in Massachusetts from Craig Irish and the Separation Agreement filed in their divorce proceeding.  After the divorce, Dawn brought suit in federal court, rather than state court, arguing that Craig did not fully disclose his assets or deal in good faith during the negotiation of their Separation Agreement. The federal court exercised jurisdiction over those claims.

We do not reach Craig's challenges to the merits of the district court's decision because we hold that the district court lacked subject matter jurisdiction pursuant to the domestic relations exception to federal diversity jurisdiction. Accordingly, we vacate the judgment and remand for dismissal of the action, with prejudice as to federal jurisdiction and without prejudice as to any state court action Dawn might bring.

I.

We derive the following facts from Dawn's allegations in federal court.  Dawn and Craig Irish wed on October 3, 1992. During their marriage, Craig worked at Nuclear Logistics, Inc. ("NLI"), eventually serving as an officer and acquiring a minority ownership stake in the company, while Dawn primarily maintained the marital home.  On February 4, 2009, Craig filed for divorce.

Craig and Dawn, each represented by counsel, thereafter negotiated the terms of a Separation Agreement, which, inter alia,

- 3 -

provided for alimony and divided their marital assets. The agreement divided all marital assets equally, with the exception of Craig's ownership stake in NLI. At the parties' final pre-divorce conference, Dawn produced a draft agreement under which she would receive 20% of Craig's total interest in the company. But at Craig's urging, Dawn agreed to amend the relevant provision to give Dawn 24 shares of NLI instead, which was 20% of the 120 shares Craig represented he owned. Dawn later attested that she consented to this revision because Craig "had represented many times that he would not get any more from a sale [of NLI] than his 6% equity entitled him to."

In the same provision dividing the shares, Craig promised that he would do "nothing to deprive [Dawn] of the benefits intended by this agreement, including . . . entering into any agreement intended to diminish [her] share of any compensation paid for [his] interest in [NLI]." In addition, three different provisions referenced Craig's "Financial Statement," which was submitted to the Middlesex Probate and Family Court along with the Separation Agreement, and contained the following clause: "I certify under the penalties of perjury that the information stated on this Financial Statement . . . is complete, true, and accurate."

On January 21, 2010 -- the same day that the Irishes filed their Separation Agreement -- the probate court entered a judgment of divorce nisi. Under Massachusetts law, when parties

asserting an irrievable breakdown in their marriage file a separation agreement in their divorce proceeding, the state probate court must determine whether it approves of that agreement, and that "agreement either shall be incorporated and merged into [the divorce] judgment or by agreement of the parties, it shall be incorporated and not merged, but shall survive and remain as an independent contract." Mass. Gen. Laws ch. 208, § 1A; see also id. § 1B. In its judgment, the probate court found that the Irishes' agreement was "fair and reasonable," and "ordered that the parties shall comply with [its] terms." Additionally, and in line with parallel language in the agreement itself, the probate court declared that the agreement was "incorporated and not merged in" the divorce judgment and that it would "survive and have independent legal significance."

Roughly two years after the divorce became final, NLI was acquired for $80,000,000, plus $20,000,000 in potential earn-out compensation. Despite having disclosed only a 6% ownership stake during negotiations about the Separation Agreement with Dawn, Craig received a payment of $21,600,000 from the sale of NLI.

On November 15, 2012, Dawn chose to file a complaint in federal district court in Massachusetts based on diversity jurisdiction, alleging various contract, tort, and fraud claims against Craig and two other parties not relevant to this appeal.

- 5 -

The primary basis for Dawn's suit against Craig was her claimed entitlement to 20% of the $21,600,000 payment. Pointing to emails between Craig and his accountant that support her contention, Dawn insisted that Craig concealed a pre-divorce "side deal," which granted him "phantom equity" well beyond the 6% interest he purported to hold in shares. Accordingly, she sought compensation equal to 20% of his actual profits from the sale, rather than 20% of his 120 shares. Craig, through his pleadings, denied the existence of a side deal. He characterized the $21,600,000 payment as a "bonus" unrelated to any "interest or expectancy due . . . at the time of the divorce." Dawn also claimed entitlement to 50% of $53,719.47 in uncashed checks that she alleged Craig had failed to disclose during negotiations, pursuant to the equal division of non-NLI assets in the Separation Agreement.

On January 22, 2014, the court entertained Craig's motion to dismiss for lack of subject matter jurisdiction based on the domestic relations exception to federal diversity jurisdiction. From the bench, the court granted Craig's motion as to the claims sounding in tort and fraud, reasoning that they dealt with "the formation of the divorce decree," and that to decide them would therefore "necessarily involve[] a revision of that decree."[1] However, the court denied Craig's motion as to the

_____

[1] Dawn does not appeal the district court's dismissal of her tort and fraud claims, and we need not address the propriety

- 6 -

contract claims, reasoning that they dealt with the Separation Agreement, which was "to be performed over time, [separate from] the [divorce] decree [that] can stand as it is."

Thus, even though Dawn and Craig agreed that the probate court would have jurisdiction to try all of the claims, the federal court dismissed the tort and fraud claims but not the contract claims. Instead, the court entered an order "remand[ing]" the contract claims to the probate court so that the entire case could be tried together, despite the fact that the case had not come from the probate court. The court explained that if the claims were "not in fact adjudicated" in the probate court, either party could move to reopen the federal case "upon the conclusion of such proceedings as there may be in the" probate court.

On May 30, 2014, Dawn moved to have the contract claims set for trial in the federal district court. In her motion, she stated that the probate court had been "unwilling to recognize the remand order as valid, [as] the matter did not originate" there, but she attached no document or order from that court. She also alleged that if she wished to proceed in a state probate court, she would need to "file a new action and start over." At oral argument for this appeal, Dawn's counsel conceded that Dawn never attempted to file a complaint or other paper in the probate court.

of that decision.

Dawn's counsel further stated that Dawn preferred to have the contract claims promptly resolved, even at the expense of her tort and fraud claims, and that was why she had returned to federal court.

The district court granted Dawn's motion to reopen the case on June 2, 2014, and two days later, Craig filed a motion for reconsideration. Craig noted that "it [was] not clear what exactly, if anything, [Dawn had] been doing in the Probate Court in [the preceding] five months," but she had not initiated a "new action," and the district court should not sanction her "whimsical forum shopping." The district court denied Craig's motion the following day. In light of the court's decision to exercise jurisdiction, the parties agreed to a case-stated hearing on the issue of liability.

Following that hearing on the merits, the court determined that Craig had in fact concealed equity in NLI from Dawn during the divorce. From this the court concluded that Craig was in breach of two terms of the Separation Agreement, as well as the implied covenant of good faith and fair dealing. Specifically, the court found that Craig had (1) breached the promise in his Financial Statement -- which the court deemed a part of the agreement -- to fully disclose his assets; (2) breached the promise in the agreement itself to do nothing to diminish Dawn's share of his interest in NLI; and (3) acted in bad faith by structuring and

- 8 -

representing his interest in NLI as he did.  The court also declared Craig liable in contract for concealing uncashed checks.

In a footnote to its June 2015 merits opinion, the court explained its rationale for asserting jurisdiction over the contract claims.  According to the court, because the assets at issue were not disclosed "and thus [were] not litigated in the original divorce proceeding," "no judgment the Court could make with regard to these assets would 'alter a divorce decree' in such a way that would bring the matter within the domestic relations exception."

After a bench trial on the issue of damages, the court awarded Dawn (1) $3,840,000, representing 20% of the $21,600,000 that Craig had earned from the NLI sale, minus the share that Dawn had already received; (2) $26,859.74, representing 50% of the $53,719.47 that Craig had concealed in uncashed checks; and (3) pre-judgment interest on both sums.

Craig appeals, raising several challenges to the district court's findings and jurisdiction.  Because we agree that the domestic relations exception precluded federal jurisdiction, we reach only that issue.

## II.

A district court's "conclusion regarding the existence vel non of subject matter jurisdiction is a question of law subject to de novo review."  Skwira v. United States, 344 F.3d 64, 72 (1st

Cir. 2003). Because the domestic relations exception pertains to subject matter jurisdiction, parties cannot waive challenges based on it. Dunn v. Cometa, 238 F.3d 38, 41 (1st Cir. 2001).

The domestic relations exception divests federal courts of jurisdiction over "a narrow range of [cases implicating] domestic relations issues" that would otherwise meet the requirements for federal diversity jurisdiction under 28 U.S.C. § 1332(a). Marshall v. Marshall, 547 U.S. 293, 307 (2006) (quoting Ankenbrandt v. Richards, 504 U.S. 689, 701 (1992)). Formally, it is the product of judicial construction of Congress's intent in enacting the diversity jurisdiction statute. Ankenbrandt, 504 U.S. at 700-01. One commentator suggests that the Supreme Court has anchored the exception in congressional acquiescence to federal court decisions and the policy considerations underlying them. See Richard H. Fallon et al., Hart and Wechsler's The Federal Courts and The Federal System 1331 (4th ed. 1996). Chief among those policy considerations is the desire "to keep federal courts from meddling in a realm that is peculiarly delicate, that is governed by state law and institutions (e.g., family courts), and in which inter-court conflicts in policy or decrees should be kept to an absolute minimum." Dunn, 238 F.3d at 41. This desire is in line with the traditional reluctance of federal courts to sanction federal interference with matters thought to be distinctively local. See Andrews v. Andrews, 188 U.S. 14, 32

- 10 -

(1903) ("[I]t is certain that the Constitution . . . confers no power whatever upon the government of the United States to regulate marriage in the States or its dissolution . . . ."), <u>abrogated on other grounds by</u> <u>Sherrer</u> v. <u>Sherrer</u>, 334 U.S. 343, 353 (1948).

That said, we have explained that, "[i]n general, lawsuits affecting domestic relations, however substantially, are not within the exception <u>unless</u> the claim at issue is one to obtain, alter or end a divorce, alimony or child custody decree." <u>Dunn</u>, 238 F.3d at 41 (emphasis added). This is so because both <u>Ankenbrandt</u> and <u>Marshall</u> stress that the exception's circumscribed reach extends "not to the <u>subject</u> of domestic relations, but to particular [familial] status-related <u>functions</u> that fall within state power and competence." 13E Wright & Miller, <u>Federal Practice and Procedure</u> § 3609.1 (3d ed.) (emphasis added).

In that vein, this circuit has been clear that "the allocation of property incident to a divorce [is a] longstanding local function[]" of the type best reserved for "state resolution." <u>DeMauro</u> v. <u>DeMauro</u>, 115 F.3d 94, 99 (1st Cir. 1997) (citing <u>Ankenbrandt</u>, 504 U.S. at 704, 706); <u>see also</u> <u>Gonzalez Canevero</u> v. <u>Rexach</u>, 793 F.2d 417, 417 (1st Cir. 1986) (per curiam) (construing a former wife's suit, seeking damages equal to her alleged half interest in a corporation controlled by her former husband, as "a request to obtain a distribution of [marital] property" and affirming its dismissal as "a domestic relations dispute, not

- 11 -

properly encompassed within [federal] diversity jurisdiction"), abrogated on other grounds by Mooney v. Mooney, 471 F.3d 246, 248 (1st Cir. 2006).

Indeed, cognizant of the fact that property-distribution and alimony arrangements necessarily accompany a divorce, exist in inextricable relation to each other, and jointly declare rights and obligations arising from marital status under state law, other circuits have also recognized that the domestic relations exception covers attempts to determine or modify not only alimony awards but also the division of marital property pursuant to a divorce.  See, e.g., McCavey v. Barnett, 629 F. App'x 865, 867 (11th Cir. 2015) (per curiam) (unpublished opinion); Wallace v. Wallace, 736 F.3d 764, 766 (8th Cir. 2013); McLaughlin v. Cotner, 193 F.3d 410, 413 (6th Cir. 1999), cert. denied, 529 U.S. 1008 (2000).  In our view, there is not more published law on this subject because few claims to divide marital property are ever filed in federal court.  This reflects an understanding that the federal forum is inappropriate and reinforces the exception's policy rationale: state courts are experts at dividing marital property, entering the necessary decrees, and handling the sensitive conflicts that follow.  See Ankenbrandt, 504 U.S. at 704.  This logic extends to the subject matter of the case before us -- a dispute over property arising from a separation agreement

that ordered alimony, divided marital assets, and was incorporated into a probate court's divorce decree.

## III.

The district court based its assertion of jurisdiction on the notion that, because the assets at issue had never been divided by the state probate court, no federal adjudication as to them could alter an existing domestic relations decree. Our contrary view is that in effectively classifying the assets as marital and allocating them in the first instance, the district court altered an existing domestic relations decree pertaining to divorce and alimony, by amending it and adding new terms to it, as well as by determining the meaning of that decree, which had been entered by the state probate court. Thus, the district court committed error by not dismissing Dawn's particular contract claims, which she had improperly brought in federal court, and then compounded that error by provisionally "remanding" the claims to a state probate court in which they did not originate instead of dismissing them for lack of jurisdiction. The court then erred once more by granting Dawn's motion to reopen the adjudication of those claims in federal court. State courts are perfectly competent to address the issues raised by Dawn's claims, and federal courts have no business "allocating property that [should be] in the custody of a state court, or interfering with" a

distribution already made by a state court.  See 13E Wright & Miller, supra, § 3609.1 (3d ed.).

Dawn contends that the district court did not perform a domestic relations function, and she relies heavily, but mistakenly, on Dunn, 238 F.3d 38, and Mooney, 471 F.3d 246.  In the former case, this court considered tort claims, brought by a father against the ex-wife of his incapacitated son, alleging that she had mismanaged the son's care and finances.  Dunn, 238 F.3d at 39-40.  This court held the domestic relations exception inapplicable although, in theory, the conduct giving rise to those claims for damages could have also formed the basis of a charge in the ex-spouses' earlier divorce proceeding, which would have affected the level of alimony awarded to the son.  Id. at 41. Notwithstanding the possible connection to a divorce decree, this court recognized that the plaintiff was not asking the court to grant him alimony or to disturb his earlier award, but rather to independently compensate him for a discrete injury.  Id. Here, in contrast, the claims are not so independent, as the plaintiff is asking the federal court to disturb the earlier award by granting her a larger share of the marital assets.

Ultimately, Dunn held that the circumstances counseled the federal court to abstain under Burford v. Sun Oil Co., 319 U.S. 315 (1943), and stay the federal case as to the tort claims.

238 F.3d at 42-43. We thus see no conflict between <u>Dunn</u> and our conclusion.

We reject Dawn's argument that her action is permissible in federal court not as one to obtain a division of marital property, but as one merely to enforce the division envisioned in her existing agreement with Craig. First, Dawn's self-serving characterization of her action does not resolve the jurisdictional issue. We look to the reality of what is going on. The domestic relations exception "governs claims over [domestic relations decrees] even where they are cloaked in the 'trappings' of another type of claim." <u>Mandel</u> v. <u>Town of Orleans</u>, 326 F.3d 267, 271 (1st Cir. 2003) (citation omitted); <u>see also</u> <u>Sutter</u> v. <u>Pitts</u>, 639 F.2d 842, 844 (1st Cir. 1981) ("Although [plaintiff] clothed her complaint in the garb of a civil rights action, . . . her claim boil[ed] down to a demand for [child] custody . . . 'best left to the states.'" (citation omitted)). It is an "uncontroversial proposition that a plaintiff may not artfully cast a suit seeking to [create or] modify . . . a [domestic relations] decree as a state-law contract or tort claim in order to access the federal courts." <u>Chevalier</u> v. <u>Estate of Barnhart</u>, 803 F.3d 789, 795-96 (6th Cir. 2015). And "[i]t is incumbent upon the . . . court to sift through the claims . . . to determine the true character of the dispute to be adjudicated." <u>Firestone</u> v. <u>Cleveland Tr. Co.</u>, 654 F.2d 1212, 1216 (6th Cir. 1981).

Second, while it is true -- as we noted in Mooney -- that state law, depending on the nature of the claims in the post-divorce suit, may provide for a further action in the probate court, see, e.g., Carpenter v. Carpenter, 901 N.E.2d 694, 699-700 (Mass. App. Ct. 2009), or an independent action in superior court, see, e.g., Reed v. Luther, No. MICV201101210, 2011 WL 6975979, at *3 (Mass. Super. Ct. Nov. 28, 2011), that fact does not decide the question of whether there is federal jurisdiction, which is a matter of federal law, see Dunn, 238 F.3d at 42.

In any event, Dawn's action is clearly distinct from the model independent "enforcement" action conceived of in Mooney -- a suit to enforce compliance with a separation agreement's terms ordering alimony -- and the converse action actually before the Mooney court -- a suit to have the agreement deemed unenforceable due to defects at contract formation.  See 471 F.3d at 247.

Dawn does not seek to compel a payment actually due under her agreement.  And she claims she does not seek rescission, even though the basis of her charge is also a defect at contract formation.[2]  Disjointedly, she alleges she was induced to enter a

---

[2]    Mooney also pointed out a 1985 opinion of the Massachusetts Supreme Judicial Court, Saltmarsh v. Saltmarsh, 480 N.E.2d 618 (Mass. 1985), which stressed that a party seeking rescission of a separation agreement, on the grounds that her "husband had made various misstatements to her on which she had relied in agreeing to" it, should do so in the original divorce court rather than assert that claim by way of an independent post-divorce action.  See id. at 620.  Dawn's claims are strikingly

deal for which she would not have bargained, but styles her requested remedy as the benefit of what she bargained for. Yet, since the agreement is silent as to the proper division of the assets at issue, rather than effectuate the parties' manifest intent, the federal court is asked to decide upon an equitable distribution of marital property in the first instance.

As this court explained in Dunn, a single series of acts, such as fraud, can give rise to many different kinds of suits, including one for "civil tort [damages], [one for] divorce[,] and surely [one for] the allocation of property incident to a divorce." 238 F.3d at 41. While certain types of contract disputes would not fall under the domestic relations exception, the claims on appeal in this case do. Unlike the tort suit in Dunn, which had domestic relations overtones but asked the court merely to adjudicate "breach of fiduciary duty[,] negligence and waste" claims well within a federal court's competence, id., Dawn's suit actually asks the court to perform a domestic relations function reserved for state courts. Specifically, though her complaint is drafted to sound in contract law (a request for damages for breached disclosure and good-faith obligations), Dawn's suit calls upon the federal court to determine whether certain assets were

---

similar to those described in Saltmarsh, which further reinforces our conclusion. She does not brief whether Saltmarsh would preclude her independent action as a matter of state law.

acquired and held by Craig during the marriage and then to decide what share of them should have been apportioned to Dawn upon the parties' separation.  The resulting "damages" award operates as a sub silentio assignment of part of the Irishes' marital estate, on top of the preexisting arrangement approved by the probate court.[3] See Mass. Gen. Laws ch. 208, § 1A.

IV.

In concluding that the district court lacked subject matter jurisdiction pursuant to the domestic relations exception -- without considering any of Craig's other grounds for appeal -- we make no appraisal of the merits of Dawn's claims.  We simply hold that a federal court was an improper forum for them.

The judgment of the district court is vacated, and the case is remanded with instructions to dismiss the federal suit with prejudice for want of jurisdiction.  The dismissal is without prejudice as to the assertion of similar claims in an appropriate state court.

So ordered.  Each party to bear its own costs.

---

[3]    While not the basis of our jurisdictional holding, the structure of the award that the district court ultimately granted to Dawn confirms our concerns.  In splitting assets 80-20 and 50-50, the court did not calculate the sum of Dawn's damages from breached disclosure and good-faith obligations so much as declare what it believed to be an equitable division of those assets.