MARK A. GOLDSMITH, United States District Judge
This matter is before the Court on Defendant's motion to dismiss for lack of subject-matter jurisdiction (Dkt. 8) and Plaintiff's motion for leave to file first amended complaint (Dkt. 14). The issues were fully briefed, and hearings were held on November 7, 2017 and February 15, 2018. For the reasons that follow, the Court grants Plaintiff's motion and denies, as moot, Defendant's motion.
I. BACKGROUND
Plaintiff Marilynn Boesky is a resident of California, and the owner of a membership interest in Pearlman LLC. Compl. ¶¶ 1, 3 (Dkt. 1). Defendant Kent Siegel is a resident of Michigan, and has been the sole manager of Pearlman LLC since 2014. Id. ¶¶ 2, 4, 14-15.
According to Boesky's initial complaint, for tax year 2015, Siegel sent her a K-1-a tax form used for reporting a partner or LLC member's distributive share of items such as income or loss-which stated her interest in Pearlman LLC to be 5% of the profits, 5% of the losses, and 22.5% of the capital. Id. ¶ 17. This was consistent with the K-1s that had been sent to her annually, starting in 2006 when the LLC was formed. Id. ¶ 16. Contrary to this nearly decade-long practice, Siegel later sent an amended K-1 for tax year 2015, which described her share as 5% of the profits, 5% of the losses, and 5% of the capital. Id. Boesky claimed that she received no explanation for this change. Id. ¶ 18. However, after Boesky questioned this discrepancy, Siegel wrote to "disregard ... [t]he amended K-1. In retrospect, I have decided to retain the historic equity percentages, that have been reported since inception." 7/27/2016 email from Siegel to Roger Boesky at 1, Ex. 4 to Am. Compl. (Dkt. 14-1). For the following tax year, 2016, Siegel sent a K-1 showing Boesky retaining her historical 22.5% capital interest. Am. Comp. ¶ 18.
Boesky alleged that Siegel exercises complete and exclusive control over Pearlman LLC's books, records, bank accounts, transactions, and member distributions, and that Siegel failed, refused, and neglected *781 to provide her any information that she requires to determine the financial condition of the company. Id. ¶¶ 20-21. Boesky alleged that the only financial information she has received are the K-1s. Id. ¶ 22. She claims that she requested additional information from Siegel so that she could calculate the value of her interest, but Siegel stated that he would only comply with a request for documents if made by an appraiser. Id. ¶¶ 23-34.
As a consequence, Boesky filed suit, on June 28, 2017, asserting a violation of Michigan's Limited Liability Company Act, Mich. Comp. Laws § 450.4101 et seq., and a violation of the company's operating agreement. Compl. ¶¶ 35-45. On both claims, she sought declaratory relief that she was entitled to the production of several categories of financial documents; she also claimed entitlement to an explanation for the reduction of her interest.
In lieu of filing an answer, Siegel filed a motion to dismiss for lack of subject-matter jurisdiction (Dkt. 8). He argued that the $75,000 amount in controversy in this diversity action had not been met, based on the theory that enforcement of a right to inspect documents has no determinable monetary value.
Following full briefing and a hearing on the motion to dismiss, Boesky filed a motion for leave to file an amended complaint (Dkt. 14). According to Boesky, events that took place after the initiation of her suit-the purported dissolution of Pearlman LLC-requires amending the complaint, so that Boesky can secure a declaratory ruling confirming her 22.5% interest in the capital of Pearlman LLC. See Pl. Mot. for Leave at 1-3. Siegel opposes the motion to amend on jurisdictional grounds, contending that the probate exception to diversity jurisdiction bars this Court's adjudication of her rights in Pearlman LLC; he also contends that amendment would be futile.
II. STANDARD OF DECISION
Federal Rule of Civil Procedure 15(a)(2) governs amendments to complaints by leave, and provides that the "court should freely give leave when justice so requires." The Supreme Court has explained that a plaintiff should be granted leave to amend "[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).
"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 420 (6th Cir. 2000). On a motion to dismiss pursuant to Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. The Court must assume that all alleged facts are true, even when their truth is doubtful, and must make all reasonable inferences in favor in of the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint will be dismissed unless it states a "plausible claim for relief." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
III. ANALYSIS
Siegel argues that Boesky's motion for leave to file an amended complaint should be denied for two reasons. First, Siegel *782 argues that the probate exception to diversity jurisdiction precludes consideration of the new claim. Second, Siegel contends that the amendment would be futile because Boesky is barred, as a matter of law, from claiming an ownership interest different from that set forth in the operating agreement. The Court disagrees as to both points.
A. Probate Exception
With limited exceptions, federal courts have diversity jurisdiction over all actions between citizens of different states so long as the amount-in-controversy exceeds $75,000. See 28 U.S.C. § 1332. One such limited exception, applicable in diversity cases and cases based on other jurisdictional grounds, is known as the probate exception. Characterized as "narrow" in the most recent Supreme Court case to address it, Marshall v. Marshall, 547 U.S. 293, 305, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006), the exception prevents federal courts from hearing cases that fall into one of three limited categories: the annulment of a will, the administration of a decedent's estate, or the disposal of "property that is in the custody of a state probate court." Id. at 312, 126 S.Ct. 1735. In Marshall, the Supreme Court explained that this last category-the only one relevant to our case-was "essentially a reiteration of the general principle that, when one court is exercising in rem jurisdiction over a res, a second court will not assume in rem jurisdiction over the same res." Id. at 311, 126 S.Ct. 1735. Federal courts of appeals, considering the doctrine post- Marshall, have concluded that "[a] case does not fall under the probate exception if it merely impacts a state court's performance of one of these tasks." Lee Graham Shopping Center, LLC v. Estate of Kirsch, 777 F.3d 678, 681 (4th Cir. 2015) (citing Three Keys Ltd. v. SR Util. Holding Co., 540 F.3d 220, 227 (3d Cir. 2008) ).
In his response to the motion to amend (Dkt. 15), Siegel argues that the probate exception applies in this case, based on an Oakland County Probate Court order that addressed an aspect of the dissolution of Pearlman LLC. Siegel's theory is that, by virtue of that order, the LLC came within the custody of the probate court, thereby depriving this Court of jurisdiction to adjudicate Boesky's ownership interest in the LLC. To understand the error in Siegel's theory requires a review of the structure of Pearlman LLC and review of the probate court proceedings.
The operating agreement, executed in 2006, defines the ownership interests of Pearlman LLC as follows: Abe Pearlman, trustee (40%); Sylvia Pearlman, trustee (40%); and the remaining 20% divided equally among their four daughters, including Boesky. See Ex. A to Operating Agreement, Ex. 2 to Compl. (Dkt. 1-3). The agreement also divided the interests into voting and non-voting interests; only the Abe and Sylvia Pearlman trust interests were voting interests. The agreement does not define the trusts for which Abe and Sylvia were trustees, but it is undisputed that they were trustees of their individual revocable trusts. See Compl. ¶ 12.
In 2009, the Pearlmans conveyed their respective trust interests to Richard A. Polk, as trustee of the Abe S. and Sylvia Pearlman Irrevocable Trust. The beneficiaries of the irrevocable trust were two daughters and two granddaughters (the survivors of a third daughter, who had died). Boesky was not a beneficiary of the irrevocable trust; she only held an interest in the LLC. See id. ¶ 13.
Upon the death of Sylvia Pearlman (Abe having pre-deceased her), Siegel became sole manager of the LLC, either in 2014 or *783 2015. See id. ¶¶ 14-15.[1] Boesky sought financial documents pertaining to the LLC for use in a potential buy-out of her interest. See id. ¶¶ 26-27. Siegel would agree to production only under certain conditions that Boesky found unacceptable, leading to the filing of the instant suit. See id. ¶¶ 29, 32, 34.
While the motion to dismiss was pending, Polk, as trustee, filed a petition on September 7, 2017 in the Oakland Probate Court relative to the dissolution of the LLC. Consents and waivers of notice were sent and executed by the beneficiaries of the trust. See Proof of Service, Ex. 8 to 2/26/2018 Filing of Probate Court Record (Dkt. 19). No consent or notice was sent to Boesky, id.; Petition, Ex. 2 to Filing of Probate Court Record, ¶ 6, and she was not otherwise notified of the probate court proceeding, see Am. Compl. ¶ 37.
The petition sought an order "[a]pproving and confirming the Trustee's authority as sole Class A voting Member interest to direct the dissolution of Pearlman Limited Liability Company; and to distribute the interests as provided in the Plan of Distribution." Petition at 3. The Plan of Distribution (called a "Plan of Dissolution" in the plan documents) provided for each member of the LLC to receive an in-kind "proportionate" share in each of the 43 investments of the LLC. See Ex. A to Operating Agreement. As explained in the petition, the purpose for the dissolution was to advance the supposed goal of Abe and Sylvia Pearlman "to segregate Marilynn Boesky's financial interest from the balance of the family ... as she will have no further dealings with the family while possessing the same assets in her own name." Petition ¶ 7.
The order that was entered does not exactly track the language used in the petition. Rather than "approve" and "authorize" the trustee's authority to "direct the dissolution" of the company-which was the language used in the petition-the order "authorized" the trustee "to vote all Class A stock to distribute the interest as provided in the Plan of Distribution ...." 9/27/2017 Order, Ex. 7 to Filing of Probate Court Record. The order mentions nothing about dissolution, except in the title. Id. ("Order Granting Petition for Limited Supervision of the Trust and to Confirm Trustee's Authority to Dissolve Pearlman Limited Liability Company and Returning Matter to Unsupervised Status").
Further, the use of the singular "interest" rather than the plural "interests," if intentional, is puzzling, because the Plan of Dissolution would appear to distribute multiple interests, not just one. In addition, the order does not clearly state that it is authorizing a distribution. It authorizes the trustee to "vote all Class A stock to distribute"-leaving it unclear whether "to distribute" simply describes the nature of the vote (i.e. authorizing a vote to dissolve the LLC), or whether it was authorizing the vote to dissolve and authorizing all of the consequential acts of distribution. The actual acts of distribution would follow dissolution over the course of many months, if not years, as the owners or managers of each of the 43 investments would have to be contacted to transform the investment interests of the LLC into separate interests of its five members.
Yet another ambiguity is what was meant by the phrase "as provided in the Plan of Distribution." Like the phrase "to *784 distribute," the phrase "as provided in the Plan" could be understood in different ways: it might plausibly refer solely to the decision to vote for dissolution, or, more specifically, to the transformation of the members' LLC interests into individual members' in-kind interests in the 43 investments, or possibly-and this is Siegel's reading-to ratify everything stated in the plan, including the establishment of the specific interest percentages of each LLC member. The terse language of the order does not make clear which of these was the probate court's intention.
These imperfections in the order-all the product of trustee's counsel, who presented the order on his firm's pleading paper for entry by the probate court-may have implications for issues beyond this case. But for purposes of the immediate motion, they serve to show that what the probate court order accomplished is not entirely free from doubt, beyond confirming the power of the trustee to vote for dissolution.
In fact, that limited purpose was the only purpose of the petition, according to the representation to the probate court made by the trustee's counsel at the hearing on the petition. 9/27/2017 Tr. at 3 ("I ask for your Honor to approve my client's authority to vote the stock to dissolve an LLC."). That same limited purpose was articulated by the trustee himself in the notice of dissolution that he subsequently issued. See Notice of Dissolution, Ex. 4 to Resp. to Pl. Mot. for Leave (Dkt. 15-1) ("The Trust sought confirmation in the Oakland County Probate Court of the authority of the undersigned to direct the dissolution of the LLC ... Such order was granted.").
What is clear is that the probate court did not expressly approve the percentage interests of the LLC members. Siegel's contention to the contrary is mystifying. See Resp. to Mot. for Leave at 8. ("[T]he probate court expressly approved the allocation of membership interests to the members of the LLC."). The petition did not expressly ask for that relief; that issue was not raised at the hearing; and the language of the court's order contains no express mention of the membership interests. Siegel's theory seems to be that the language "as provided in the Plan" is an "express" approval of the membership interests. However, it is neither "express," nor-due to the ambiguities noted above-is it even implied.
Indeed, if Siegel's theory were true-that the trustee and his counsel had sought and secured a judicial blessing of the LLC members' individual percentage interests-that would be deeply troubling. The trustee's counsel announced to the probate judge at the hearing "[c]onsents and waivers of notice have been filed by all parties in interest ..." 9/27/2017 Tr. at 3. Yet it is undisputed that Boesky did not receive any such notice and signed no consent. If her interest in the LLC was to be judicially determined to be 5%, she was clearly interested in that adjudication. How could trustee's counsel, then, tell the probate court that "all parties in interest" consented to the relief and waived notice?
It must be stressed that the attorney who made this representation to the probate court is the same attorney with whom Boesky's attorney had been corresponding pre-suit over several months demanding financial documents of the LLC; and this attorney's firm represents Siegel against the complaint in this action, filed in June (months before the November probate court hearing), which sought an explanation for the purported diminution of her LLC interest. See Emails, Exs. 5-11 to Compl. (Dkt. 1-6-1-12). The attorney who appeared in the probate court and assured the judge that "all parties in interest" consented to the relief would have known, at a minimum, that Siegel had initially issued a *785 K-1 to Boesky showing her interest at 22.5%; and that Siegel had issued an amended K-1 showing it at 5%, which Boesky had questioned. He may also have known the facts alleged in the proposed amended complaint-that a year before this suit was filed Siegel had retracted the amended K-1, in an email stating that he had "decided to retain the historic equity percentages," and further telling Boesky to use the initial K-1. Whatever the precise state of his knowledge, he knew at the time he appeared before the probate court that Boesky did not acquiesce in the view that her interest was limited to 5%. To conclude that the probate court was asked by this attorney to determine-and did determine-Boesky's interest to be 5%, based on his representation that "all parties in interest" have consented, this Court would have to conclude that trustee's counsel dissembled before the probate court.
Because this Court is reluctant to ascribe sharp practice to trustee's counsel, a more plausible interpretation is that the probate court was not asked to, and did not, rule on the individual membership interests. The only unambiguously discernable action of the probate court was to confirm the trustee's power to dissolve the LLC-not to fix the percentage interests of the individual members.
The significance of all of this for the probate exception is straightforward. The LLC interests of the individual members were never property "in the custody" of the probate court. That court did not purport expressly, or even impliedly, to define Boesky's interest. Thus this Court's jurisdiction to make such a ruling is not precluded on a theory that do so would dispose of property in the custody of the Oakland County Probate Court.
Case law does not extensively discuss what it means for property to be "in the custody" of a probate court. But if a probate court has not determined an issue regarding property that a party asks the federal court to address, it is difficult to understand how the subject property is "in the custody" of the probate court. To hold otherwise would be contrary to the animating principle of the probate exception of preventing a federal court from attempting to "wrest a res" from the control of the probate court. See Struck v Cook County Public Guardian, 508 F.3d 858, 860 (7th Cir. 2007) ("[A] court other than the one that controls the res ... should not be permitted to elbow its way into such a fight.").
Cases cited by Siegel do not counsel a different conclusion. He relies on Wisecarver v. Moore, 489 F.3d 747, 751 (6th Cir. 2007), where the court stated that the probate exception prevents a federal court from "dispos[ing] of property in a manner inconsistent with the state court's distribution of the assets." He also relies on Osborn v. Griffin, 865 F.3d 417, 436 (6th Cir. 2017), where the court stated that the probate exception is "narrowly focused on preventing federal courts from upending probate proceedings." Here, however, the state court did not clearly order any distribution of assets, and certainly not in the specific percentages that Siegel now claims. It merely confirmed the trustee's power to dissolve the LLC. A ruling by this Court about Boesky's percentage ownership would not contradict the probate court's recognition of the trustee power to dissolve the LLC; it would upend nothing that the probate court actually did.
Even if Siegel's argument is accepted that the LLC interests were, at one point, in the custody of the probate court, the probate proceedings are over, making the exception inapplicable. Case law rejects application of the probate exception, based on disposing of property within the custody of the probate court, where the probate proceedings have concluded. See, e.g., *786 Wolfram v Wolfram, 78 F.Supp.3d 758, 765 (N.D. Ill. 2015) ("[S]o if there never was a state court proceeding over the res or all state court proceedings involving the res have ended, then there is nothing to interfere with and the probate exception is inapplicable.") (emphasis added); see also Chevalier v. Estate of Barnhart, 803 F.3d 789, 802 (6th Cir. 2015) ("[O]ur task is to determine whether [plaintiff] has asked a federal court to 'elbow its way into' an ongoing 'fight [ ] over a property or a person in [another] court's control.' ") (quoting Struck, 508 F.3d at 860 ) (alterations in original) (emphasis added); Struck, 508 F.3d at 860 (applying probate exception because party was "seeking to remove into the federal court the res over which a state court is exercising control," distinguishing its earlier decision in another case, Jones v. Brennan, 465 F.3d 304, 308 (7th Cir. 2006), where it had rejected application of the probate exception because probate proceedings had been completed).
Here, the petition sought a ruling confirming the trustee's power and asked that the trust be returned to unsupervised status. The order expressly returned the trust to unsupervised status. At the hearing on the motion to amend, Siegel's counsel acknowledged that no further probate court proceedings are contemplated. With the probate proceedings regarding the LLC having concluded, the probate exception has no application.
Siegel argues that if a claim is within the exclusive jurisdiction of the probate court under state law, then it is irrelevant whether there is any ongoing probate proceeding. Def. Supp. Br. at 4 (Dkt. 20). But the probate exception is not defined by state law. As explained in Marshall, "the jurisdiction of the federal courts, 'having existed from the beginning of the Federal government, [can]not be impaired by subsequent state legislation creating courts of probate.' " Marshall, 547 U.S. at 314, 126 S.Ct. 1735 (quoting McClellan v. Carland, 217 U.S. 268, 281, 30 S.Ct. 501, 54 L.Ed. 762 (1910) ) (alteration in original). In Marshall, the Court refused to apply the probate exception to a claim-that a beneficiary under testamentary documents tortuously interfered with plaintiff's expectation of a testamentary gift-which was supposedly within the exclusive jurisdiction of the Texas probate court, stating that "[u]nder our federal system, Texas cannot render its probate courts exclusively competent to entertain a claim of that genre." Id. at 314, 126 S.Ct. 1735 ; accord Chevalier v. Barnhart, 803 F.3d at 801 ("We therefore look to only federal law to determine whether the probate exception to federal diversity jurisdiction applies."). Siegel's argument that a Michigan probate court's exclusive jurisdiction over certain matters plays some role in defining the contours of the probate exception runs afoul of both Supreme Court and Sixth Circuit authority.[2]
There is an aspect of the probate exception that may come into play regardless of *787 whether probate proceedings have commenced or remain ongoing. For example, in Wisecarver, the court held that plaintiff could seek damages in a federal court for allegedly improper inter vivos transfers, but not for damages based on probate disbursements to the defendants-beneficiaries, as such damages "would be tantamount to setting aside the will." Wisecarver, 489 F.3d at 750 n.1. But Boesky does not ask this Court to annul a will or a trust agreement (even if the latter is viewed as a will equivalent).
It is unclear whether Siegel is making an argument that the probate exception applies even when property is not in the custody of the probate court, on the theory that the exception applies to any matter that may touch on a testamentary instrument. See Def. Supp. Br. at 3 ("A practical application of the probate exception is that it should apply to a testamentary instrument that is or can be the subject of proceedings in probate court, which is what we have here.") (emphasis added). Such a broad reading of the probate exception is inconsistent with Marshall's teaching that the exception is "of distinctly limited scope." Marshall, 547 U.S. at 310, 126 S.Ct. 1735. The outer limit of Siegel's theory would be difficult, if not impossible, to define, as it would oust a federal court from adjudicating any issue that might impact an asset in which the trust holds some interest, however small.
A more limited view might be defensible. Marshall's definition of the exception as including cases involving "administration of a decedent's estate," id. at 311, 126 S.Ct. 1735, might extend to certain trust matters, although whether that prong of the probate exception should ever apply to trusts has been the subject of dispute.[3] But what Boesky asks this Court to do involves no "administration of the trust." She does not ask this Court to interpret a trust document or investigate trust affairs. Rather, the judicial task will be to interpret the LLC operating agreement and actions of the LLC manager, in an effort to determine Boesky's ownership interest in an asset that is separate and distinct from the trust. This would not come within the rubric of "the administration of a decedent's estate," under any reasonable interpretation of that concept.
For all these reasons, the Court finds that the probate exception does not apply in this action.
B. Futility of Amendment
Siegel also argues that the amendment would be futile because Boesky cannot *788 abrogate the operating agreement. Siegel contends that the integration clause in the operating agreement precludes an argument that Boesky's tax returns amended the agreement. Boesky responds that the integration clause merely bars prior or contemporaneous agreements, but not any subsequent agreements. She argues that Siegel's refusal to provide any documents prevents her from knowing what has occurred since the operating agreement was signed, but that the K-1s consistently showing her owning 22.5% of the capital in Pearlman LLC indicate that the ownership interests were for many years understood to be different from what is set forth in the operating agreement. This would support an inference that the ownership percentages were modified in some way.
At this stage, Boesky has the better of this argument. As she observes, Siegel's parol evidence argument only applies to agreements that were made before or during the signing of the agreement; the parol evidence rule does not bar evidence of subsequent changes. See UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich.App. 486, 579 N.W.2d 411, 414 (1998) ("The parol evidence rule may be summarized as follows: [p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous.") (alteration in original) (emphasis added) (internal quotation marks omitted). Further, there is no provision in the agreement requiring that changes to it be in writing.
Here, it can be plausibly inferred from her proposed complaint that some change occurred after the signing of the operating agreement that led to a long history of her interest being reported as a 22.5% share. Siegel may not both refuse Boesky access to Pearlman LLC's financial documents and argue, without the benefit of any discovery, that nothing has occurred that would change the distribution described in the operating agreement.
For these reasons, the Court finds that Boesky has stated a plausible claim for declaratory relief, such that the amendment is not futile.
IV. CONCLUSION
For these reasons, the Court grants Plaintiff's motion for leave to file an amended complaint (Dkt. 14). Because the amended complaint supersedes the original complaint, Siegel's motion to dismiss based on the original complaint (Dkt. 8) is denied, as moot.
Boesky shall file the amended complaint by April 2, 2018. Siegel shall answer or move by April 16, 2018. A notice for a scheduling conference will be separately issued.
SO ORDERED.

Both the initial complaint and the proposed amended complaint allege that Siegel became the sole manager on the death of Sylvia. See Comp. ¶ 15; Am. Comp. ¶ 15. However, the initial complaint alleges that Sylvia Pearlman died on August 8, 2014, Compl. ¶ 14; whereas the proposed amended complaint states that she died on August 8, 2015, Am. Compl. ¶ 14. This discrepancy is irrelevant for purposes of the present motions.

To the extent cases cited by Siegel may be read as analyzing the probate exception with reference to a probate court's exclusive jurisdiction under state law, see, e.g., In re Gentry, No. 15-14402, 2016 WL 4061248 (E.D. Mich. July 29, 2016) ; Moredock v. Moredock, No. 08-1226, 2009 WL 1974443 (W.D. Mich. July 7, 2009), such an analysis would be at variance with Marshall and Chevalier, as well. Siegel's cases, in any event, do not provide cogent support for his argument that the conclusion of probate proceedings has no bearing on the probate exception. In Gentry, the probate exception was upheld, but the probate court proceedings had been ongoing; indeed, the matter was before the district court because a party had removed the case to that court from the probate court. The Moredock opinion does not state whether there were any probate court proceedings or whether they were ongoing; those circumstances did not play a role in that court's decision to apply the probate exception.

The Fifth Circuit has rejected equating trust administration with administration of a decedent's estate, at least in the context of a revocable trust, because the assets do not become part of the decedent's estate at any point. See Curtis v. Brunsting, 704 F.3d 406, 410 (5th Cir. 2013) ("[B]ecause the assets in a living or inter vivos trust are not property of the estate at the time of the decedent's death, having been transferred to the trust years before, the trust is not in the custody of the probate court and as such the probate exception is inapplicable to disputes concerning administration of the trust."). The same would be true for the irrevocable trust in our case, to which assets of the Pearlman revocable trusts were transferred years before their death. Some courts view trusts as will substitutes for purposes of the probate exception. See, e.g., Chabot v. Chabot, No. 11-217, 2011 WL 5520927 (D. Idaho Nov. 14, 2011). The Sixth Circuit's view of the matter is less clear. In Evans v. Pearson Enterprises, Inc., 434 F.3d 839 (6th Cir. 2006), the court declined to apply the probate exception to a claim by a revocable trust grantor suing her trustee for breach of trust, reasoning that the trust was not a will substitute in the context of a claim that did not involve "any death or estate management," id. at 849 -a term that the Sixth Circuit did not define. However, the court did state, in dictum, that "federal courts have properly applied the probate exception to claims concerning trusts that act as will substitutes." Id.